1
2
3
4
5
6
7
8
9

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA — WESTERN DIVISION

| | | |
|---|---|---|
| MICHAEL NEUMEYER, | ) | Case No. EDCV 04-1079-JWJ |
| Plaintiff, | ) | |
| | ) | ORDER |
| vs. | ) | VACATING DECISION OF THE |
| | ) | ADMINISTRATIVE LAW JUDGE |
| JO ANNE B. BARNHART, | ) | AND REMANDING FOR |
| Commissioner of Social Security | ) | FURTHER PROCEEDINGS |
| Administration, | ) | |
| Defendant. | ) | |

Plaintiff seeks review of the decision of defendant, the Commissioner of the Social Security Administration, denying his application for Social Security Disability Insurance Benefits.  As discussed below, this Court affirms the decision of the Administrative Law Judge.

## I.  SUMMARY OF DISTRICT COURT PROCEEDINGS

On September 2, 2004, plaintiff filed a "Complaint" for review the decision of the Commissioner under the Social Security Act.  On September 23, 2004, the parties consented, pursuant to 28 U.S.C. § 636(c), to proceed before United States Magistrate Judge Jeffrey W. Johnson in the instant action and to have the Magistrate Judge conduct any and all further proceedings in

1   this case and order the entry of final judgment.  On January 10, 2005,

2   defendant filed an "Answer to Complaint" along with a copy of the Certified

3   Administrative Record (hereinafter "CAR") of the administrative proceedings

4   in this matter.  On April 27, 2005, the parties filed a Joint Stipulation

5   addressing their respective claims.

6          This matter is now deemed under submission and ready for decision.

7

8                    **II.  FACTUAL BACKGROUND**

9   **A.     Summary of Administrative Proceedings.**

10         On April 23, 2002, plaintiff filed an application for Social Security

11  Disability Benefits pursuant to the Social Security Act.  (CAR 69.)  His

12  application was denied initially and upon reconsideration.  Subsequently,

13  plaintiff sought a hearing.  A hearing was held on November 20, 2003, before

14  Administrative Law Judge David L. Wurzel (hereinafter "ALJ"); plaintiff

15  appeared with representation and testified on her own behalf.  (CAR 324-77.)

16  On April 14, 2004, the ALJ issued an opinion denying benefits. (CAR 8.)

17         On March 30, 2004, the Appeals Council denied review, making the

18  decision of the ALJ the final decision of the Commissioner in this matter (CAR

19  4).  See 20 C.F.R. § 404.900(a)(5).

20  **B.     Facts Regarding Plaintiff's Personal History, Medical Condition,**

21         **and Treatment**.

22         Born on January 27, 1957, plaintiff was forty-six years old at the time of

23  his administrative hearing.  (CAR 69, 328.)  Plaintiff attended high school to

24  the twelfth grade, but did not graduate.  (CAR 329.)  He has past relevant

25  work experience as a cable splicer and farm worker.  (CAR 372.)

26         On August 11, 1997, plaintiff was evaluated by Joseph Ho, M.D. in

27  relation to a work-related injury.  (CAR 174-75.)  Plaintiff explained that on

28  the preceding June 18 he had been hit on the head by a 90 to 100-pound bale

of hay that was dropped from overhead by another worker.  (CAR 174.)
Plaintiff further explained that he continued to work and that he was
reassigned to driving trucks.  (CAR 174.)  Plaintiff stated that x-ray taken on
August 1, 1997 revealed degenerative changes at C5-6 with joint space
narrowing and large osteophytes anteriorly and posteriorly.  (CAR 174.)  He
explained that at that time he was prescribed Motrin and Soma, which he did
not have filled because of a "company holdup," and that he was placed on light
duty.  (CAR 174.)  Plaintiff complained of continued headaches, with
throbbing pain at the back of his head.  (CAR 174.)  Plaintiff denied vomiting,
nausea, and blurred vision.  (CAR 174.)  He first complained of numbness and
tingling with his distal upper extremities, but later said that there was no
numbness or tingling.  (CAR 174.)  Plaintiff also complained that his fingers
would sometimes fall asleep.  (CAR 174.)

Dr. Ho reported that plaintiff held his head in a guarded position and
suffered from tenderness only at the base of the neck and on the left side at the
upper trapezius area.  (CAR 174-75.)  Plaintiff was able to extend and flex his
neck to about 45 degrees, rotate his neck to 45 degrees on both left and right
directions, tilt his head to 30 degrees to the right and 15 degrees to the left,
and flex his back forward to 90 degrees.  (CAR 175.)  Plaintiff's range of
motion in his shoulders, upper extremities, and lower extremities was intact, as
were his reflexes.  (CAR 175.)  Plaintiff's sensation and circulation was also
intact.  (CAR 175.)

Dr. Ho diagnosed "left cervical strain/tension headache."  He restricted
plaintiff's work status to lifting, pushing, and pulling up to ten pounds, with no
driving or operation of machinery.  (CAR 175.)

On August 18, 1997, plaintiff underwent a follow-up evaluation by Dr.
Ho.  (CAR 172.)  Plaintiff reported that his condition was unchanged and that
he was unable to obtain insurance authorization to fill his prescriptions.  (CAR

172.)  Dr. Ho also reported difficulties in obtaining authorization for physical therapy.  (CAR 172.)

On September 11, 1997, plaintiff began treatment with Irwin Steinberg, M.D.  (CAR 186-94.)  Plaintiff complained of headaches, pain upon movement of his head and neck, and upper and lower back pain.  (CAR 187-88.)  Plaintiff had a slight decrease in the range of motion of his cervical and lumbar spine.  (CAR 190, 191.)  Palpation of the upper back and neck revealed tightness, tenderness, and spasms of the paracervical and suprascapular masses.  (CAR 190.)  Plaintiff also exhibited tenderness to the interscapular region.  (CAR 190.)  Plaintiff's deep tendon reflexes of his biceps, triceps, and brachioradialis were all sluggish and equal bilaterally.  (CAR 190.)  Straight leg raising and concomitant descent of the lower limbs reproduced some low back pain.  (CAR 192.)

Dr. Steinberg diagnosed musculoligamentous strain of the cervicodorsal and lumbosacral spine.  (CAR 192.)  Dr. Steinberg recommended physiotherapy and restricted plaintiff from excessive exertional activities such as lifting, bending, stooping, pushing, pulling, twisting, turning, torquing, and holding weights.  (CAR 193.)  Dr. Steinberg further recommended that plaintiff continue taking over-the-counter pain medication.  (CAR 193.)  Dr. Steinberg placed plaintiff on temporary total disability status.  (CAR 193.)

On November 13, 1997, Dr. Steinberg re-evaluated plaintiff and concluded that he was permanent and stationary.  (CAR 177-81.)  Dr. Steinberg opined that plaintiff was precluded from heavy lifting and prolonged sitting.  (CAR 179.)

On July 9, 1998, George S. Watkin, M.D. completed a permanent and stationary report.  (CAR 207-16.)  Plaintiff continued to complain of headaches and back pain.  (CAR 207.)  Plaintiff exhibited tenderness over the paraspinal and trapezius musculatures on the right, and over the left lower

posterior ribs.  (CAR 211.)  Plaintiff further exhibited a decrease in range of motion of the cervical and lumbar spine.  (CAR 211, 212.)  Dr. Watkin reported paravertebral spasm with lumbar flattening, positive straight leg raising, and positive fabere maneuver.  (CAR 213.)  Dr. Watkin diagnosed sprain/strain of the cervical spine superimposed over a 3mm posterior disc bulge at C5-6, and sprain/strain of the lumbar spine superimposed over multiple disc bulges from L1 to L3-4.  (CAR 213.)  Dr. Watkin opined that plaintiff's disc bulges were not appropriate for surgical intervention at that time.  (CAR 213.)  Dr. Watkin's precluded plaintiff from heavy work due to the cervical spine condition.  (CAR 214.)  As for the lower back, Dr. Watkin precluded plaintiff from performing very heavy lifting and repetitive bending or stooping.  (CAR 214.)  Dr. Watkin concluded that plaintiff was unable to return to his job as a farm worker.  (CAR 214.)

An August 20, 1998 Residual Functional Capacity Assessment by an agency physician indicated that plaintiff could lift and/or carry up to 50 pounds occasionally and up to 25 pounds frequently, could stand and/or walk for about 6 hours in an 8-hour day, could sit for about 6 hours in an 8-hour day, and had unlimited ability to push and/or pull.  (CAR 218.)  The agency physician further opined that plaintiff could only occasionally stoop and/or crawl, and was limited in his ability to reach overhead.  (CAR 219, 220.)

On June 7, 2001, Kenneth C. Lay, M.D. completed a Primary Treating Physician's Initial Report and Treatment Plan.  (CAR 229-34.)  Plaintiff complained of constant pain in his cervical spine, radiating to the left arm and causing headaches.  (CAR 230.)  Plaintiff further complained of constant pain in the lumbar spine with decreased flexion.  (CAR 230, 232.)  Plaintiff exhibited a decreased range of motion in the neck and cervical spine.  (CAR 231.)  Dr. Lay diagnosed cervical spine strain and lumbosacral spine strain.  (CAR 232.)  Dr. Lay referred plaintiff for physical therapy and recommended a

1    surgical consult.  (CAR 233.)  Dr. Lay prescribed Darvocet and Naproxen.

2    (CAR 233.)  On July 5, 2001 and October 22, 2001, Dr. Lay examined

3    plaintiff and continued him on temporary total disability status.  (CAR 235,

4    236.)

5         On July 25, 2001, plaintiff underwent an orthopedic surgical

6    consultation by Ralph H. Steiger, M.D.  (CAR 240-47.)  Plaintiff complained

7    of neck pain with numbness and tingling in the upper extremities and constant

8    pain in the lower back.  (CAR 241.)  Plaintiff exhibited tenderness to palpation

9    of the upper trapezius and levator scapulae muscles on the left side.  (CAR

10   242.)  Plaintiff further exhibited pain in the base of the neck with axial

11   compression testing, as well as moderate tenderness of the left posterior-

12   superior iliac spine.  (CAR 242, 244.)  Plaintiff had a decreased range of

13   motion of the cervical spine, shoulders, and lumbar spine.  (CAR 242-43, 244.)

14   Dr. Steiger reported hypersthesia of the right thumb and right foot to pinwheel

15   and light touch.  (CAR 243, 244.)  Sciatic nerve root irritability signs were

16   positive, bilaterally, and straight leg raising produced contralateral pain in the

17   back.  (CAR 244.)  Dr. Steiger diagnosed disc bulges at L1-2, L2-3, L4-5, C3-4,

18   C5-6, and C6-7.  (CAR 245.)  However, Dr. Steiger opined that plaintiff was

19   not a good candidate for surgery based on the multiplicity of bulges.  (CAR

20   245.)  Dr. Steiger prescribed Celebrex and Ultram for pain.  (CAR 246.)

21        On April 30, 2002, plaintiff was examined by Alan B. Compton, M.D. at

22   the San Bernardino County Department of Behavioral Health.  (CAR 251-53.)

23   Plaintiff admitted past drug abuse, including amphetamine use eighteen days

24   prior to his examination.  (CAR 251.)  Dr. Compton reported moderate

25   grandiosity, including "a sense that [plaintiff] can exercise telepathy and

26   broadcast his thoughts."  (CAR 251.)  Dr. Compton opined that plaintiff's

27   insight was minimal.  (CAR 251.)  Dr. Compton diagnosed psychosis with

28   somewhat expansive mood, active amphetamine dependence, and suspected

1   alcohol and cannabis dependence.  (CAR 251.)  Dr. Compton prescribed
2   Zyprexa.  (CAR 251.)

3        On May 21 and 30, 2002, plaintiff failed to appear for appointments
4   with Dr. Compton.  (CAR 303, 304.)  On May 31, 2002, Dr. Compton
5   examined plaintiff and increased his dosage of Zyprexa.  (CAR 302.)

6        On June 3, 2002, agency physician Donald R. Walk, M.D. completed a
7   Psychiatric Review Technique form on plaintiff.  (CAR 255-68.)  Dr. Walk
8   opined that plaintiff suffered from an organic mental disorder resulting from
9   substance abuse and substance addiction disorder.  (CAR 255, 256, 263.)  Dr.
10  Walk concluded that with plaintiff's substance abuse he suffers from marked
11  limitations in activities of daily living, maintaining social functioning, and
12  maintaining concentration, persistence, and pace.  (CAR 265.)  However,
13  without plaintiff's substance abuse, Dr. Walk opined that plaintiff had no
14  functional limitations.  (CAR 265.)

15       On July 2, 2002, plaintiff underwent a neurological examination by
16  Manmohan Nayyar, M.D.  (CAR 271-72.)  Dr. Nayyar concluded that
17  neurologically, plaintiff is "absolutely intact."  (CAR 272.)

18       On July 30, 2002, Dr. Compton reported that plaintiff had less paranoia
19  and confused thinking with the use of Zyprexa, but noted an increased in
20  plaintiff's depressive symptoms.  (CAR 301.)  Dr. Compton continued plaintiff
21  on Zyprexa and prescribed Zoloft.  (CAR 301.)  On September 6, 2002,
22  plaintiff reported increased depression, for which Dr. Compton increased
23  plaintiff's dosage of Zoloft.  (CAR 300.)  The doctor continued plaintiff on
24  Zyprexa.  (CAR 300.)  On December 9, 2002, plaintiff admitted continued
25  marijuana use, but asserted abstinence from alcohol and amphetamines.  (CAR
26  298.)

27       On February 3, 2003, plaintiff complained to Dr. Compton of slight
28  increase in mood disturbances and poor sleep.  (CAR 297.)  Plaintiff further

1  complained that his thoughts were going faster and that his was more fearful

2  and paranoid.  (CAR 297.)  Dr. Compton reported that plaintiff had generally

3  maintained substance recovery except cannabis intermittently.  Accordingly,

4  Dr. Compton concluded that substance abuse was not fueling plaintiff's mixed

5  mood disturbances.  (CAR 297.)  Dr. Compton revised his diagnosis to

6  schizoaffective disorder, bipolar type, partially compensated, and cannabis

7  dependence in partial remission.  (CAR 297.)  Dr. Compton increased

8  plaintiff's dosage of Zyprexa and began a slow tapering off of Zoloft.  (CAR

9  297.)

10       On March 4, 2003, plaintiff appeared slightly more symptomatic.  (CAR

11  296.)  Dr. Compton continued plaintiff's Zyprexa and replaced Zoloft with

12  Celexa.  (CAR 296.)  On April 15, 2003, Dr. Compton started plaintiff on

13  Abilify and continued Zyprexa and Celexa.  (CAR 295.)  On May 13, 2003,

14  Dr. Compton reported that plaintiff was "[d]istinctly more upbeat" and

15  talkative.  (CAR 294.)  Dr. Compton discontinued plaintiff's Celexa and began

16  tapering plaintiff's Zyprexa.  (CAR 294.)  Plaintiff was continued on Abilify

17  through September 30, 2003.  (CAR 289-94.)

18       On October 3, 2002, plaintiff underwent a neurological consultation

19  with James F. Haas, M.D.  (CAR 317-23.)  Dr. Haas reported reversal of the

20  normal cervical curve, with slight increased tone in the paraspinal muscles.

21  (CAR 319.)  Dr. Haas further reported that plaintiff limited his motion of the

22  cervical spine to about 50% of anticipated normal on all plains.  (CAR 319.)

23  Dr. Haas gave an initial diagnostic impression of "[c]hronic muscle contraction

24  headaches emanating from cervical spine degenerative disease," and

25  "[a]pparent peripheral neuropathy probably worsening etiology unknown."

26  (CAR 321.)

27  ///

28  ///

**C.**     **The Hearing Before the Administrative Law Judge**.

     1.     <u>Plaintiff's Testimony.</u>

At the hearing before the ALJ, plaintiff testified that he attended high school up to the twelfth grade, but did not graduate.  (CAR 328-29.)  Plaintiff testified that he is unable to work due to "three bulged discs in [his] lower back, three bulged discs in [his] neck, numbness of the legs and hands, [and] headaches."  (CAR 354.)  Plaintiff also explained that he has two hernias in his groin.  (CAR 354.)

Plaintiff testified that he is able to walk or ride his bicycle approximately half a mile to his mailbox each day.  (CAR 360.)  He explained that his tenants provide some assistance to him in preparing meals and doing laundry.  (CAR 375-76.)

Plaintiff explained that he started drinking at age sixteen, but that he was no longer drinking.  (CAR 363.)  Plaintiff testified that when his drinking was at its heaviest, he consumed approximately one "six-pack," (presumably beer).  (CAR 363.)  He further testified that he had experienced a blackout from the consumption of whiskey approximately one and a half months before his hearing.  (CAR 363-64.)  Plaintiff explained that he started using marijuana at age fourteen or fifteen, and that at his heaviest period of usage, he smoked approximately two joints a day.  (CAR 364.)  Plaintiff also testified that he began using amphetamines in 1988, and that at his heaviest usage, he was snorting one line a day.  (CAR 365.)  Plaintiff explained that he had last used amphetamines four days before the hearing.  (CAR 366.)

Plaintiff testified that he attends Alcoholics Anonymous and Narcotics Anonymous meetings, and has the same sponsor for both programs.  (CAR 367-68.)  Plaintiff stated that he was still taking Abilify, but no longer taking any other medications.  (CAR 368.)  Plaintiff testified that he did not believe his use of drugs or alcohol caused him to be depressed.  (CAR 369-70.)

2.      The Vocational Expert's Testimony.

Vocational Expert Sandra Fiaretti (hereinafter "VE") also testified before the ALJ at plaintiff's hearing.  (CAR 371-75.)  The VE testified that plaintiff has past relevant work experience as a cable splicer and farm worker.  (CAR 372.)  The ALJ then presented the VE with a hypothetical individual of the same age, education, and work history as plaintiff; the hypothetical individual could carry 25 pounds frequently and 50 pounds occasionally, sit for 2 hours at a time for a total of 6 hours per workday, and stand and/or walk for 2 hours at a time for a total of 6 hours per workday.  (CAR 373.)  Additionally, the hypothetical individual was unable to climb ladders, ropes, or scaffolds except in an emergency; only occasionally could he climb ramps and stairs, stoop, crouch, balance, kneel, and crawl.  (CAR 373.)  The hypothetical individual must avoid concentrated exposure to dangerous moving machinery, electric shock, radiation, unprotected heights, extremes of temperature, and the sun.  (CAR 373.)  Finally, the hypothetical individual's mental limitations restrict him to unskilled work with no close or frequent interpersonal contact with supervisors, co-workers, or the public.  (CAR 373.)  The VE testified that such an individual could not perform plaintiff's past relevant work (CAR 373.), but could perform work as a cleaner -- 3,000 positions of which exist regionally and 40,000 nationally, and hand packager -- 7,000 positions of which exist regionally and 90,000 nationally (CAR 374).

The ALJ then presented the VE with a second hypothetical individual identical to the first except that the individual would be limited to work at the light exertional level.  (CAR 374.)  The VE testified that such an individual could perform work as a housekeeper -- 6,000 positions of which exist regionally and 50,000 nationally -- and small products assembler -- 9,700 positions of which exist regionally and 50,000 nationally.  (CAR 374.)

Finally, the ALJ presented the VE with a third hypothetical individual

1   identical to the first hypothetical but restricted to work at the sedentary

2   exertional level.  (CAR 374.)  The VE testified that such an individual could

3   perform work as an assembler of buttons and notions -- 1,200 positions of

4   which exist regionally and 16,000 nationally -- and optical assembler -- 2,800

5   positions of which exist regionally and 5,700 nationally.  (CAR 375.)

6   **D.   The ALJ's Decision.**

7        On April 14, 2004, the ALJ issued a decision denying plaintiff's

8   application for Disability Insurance Benefits.  (CAR 8-32.)  The ALJ

9   determined that plaintiff has medically determinable impairments consisting of

10  degenerative disc disease of the cervical and lumbosacral spine, headaches,

11  psychotic disorder, and polysubstance abuse, which in combination are

12  considered "severe."  (CAR 18.)  However, the ALJ concluded that "with drug

13  abuse and alcoholism <u>excluded</u> from the assessment, the claimant's condition

14  does not meet or equal any listing."  (CAR 21.)  The ALJ also found that

15  plaintiff cannot perform his past relevant work, but maintains the residual

16  functional capacity to perform work at the light and sedentary exertional levels.

17  (CAR 21, 29.)  Accordingly, the ALJ concluded that plaintiff is not disabled as

18  defined in the Social Security Act.  (CAR 30.)

19

20              **III.  STANDARD OF REVIEW**

21       Under 42 U.S.C. § 405 (g), a district court may review the

22  Commissioner's decision to deny benefits.  The Commissioner's  (ALJ's)

23  findings and decision should be upheld if they are free of legal error and

24  supported by substantial evidence.  However, if the court determines that

25  findings are based on legal error or are not supported by substantial evidence in

26  the record, the court may reject the findings and set aside the decision to deny

27  benefits.  <u>See</u> <u>McCartey v. Massanari</u>, 298 F.3d 1072, 1075 (9th Cir. 2002);

28  <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1147 (9th Cir. 2001); <u>Osenbrock v.</u>

1   Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001).

2       "Substantial evidence is more than a scintilla, but less than a

3   preponderance." Reddick, 157 F.3d 715, 720 (9th Cir. 1998).  It is "relevant

4   evidence which a reasonable person might accept as adequate to support a

5   conclusion." Id.  To determine whether substantial evidence supports a

6   Commissioner's findings, the reviewing court "must review the administrative

7   record as a whole, weighing both the evidence that supports and the evidence

8   that detracts from the Commissioner's conclusion." Id.  "If the evidence can

9   reasonably support either affirming or reversing," the reviewing court "may not

10  substitute its judgment" for that of the Commissioner.  Reddick, 157 F.3d at

11  720-721; see also Osenbrock, 240 F.3d at 1162.

12

13                    **IV.  THE FIVE-STEP ANALYSIS**

14       **A.     Initial Five-Step Analysis.**

15       A disability claimant must show that a medically determinable physical

16  or mental impairment prevents the claimant from engaging in substantial

17  gainful activity and that the impairment is expected to result in death or to last

18  for a continuous period of at least twelve months.  Reddick v. Chater, 157 F.2d

19  at 721; 42 U.S.C. § 423 (d)(1)(A).

20       Disability claims are evaluated according to the five-step procedure

21  described below.  See Bowen v. Yucker, 482 U.S. 137, 140-42, 107 S. Ct.

22  2287, 96 L. Ed. 2d 119 (1987); Reddick, 157 F.3d at 721; Lester v. Chater, 81

23  F.3d 821, 828 n.5 (9th Cir. 1995, as amended April 9, 1996); 20 C.F.R §§

24  404.1520, 416.920.

25       **Step one:** Is the claimant engaging in substantial gainful activity?  If so,

26  the claimant is found not disabled.  If not, proceed to step two.

27       **Step two:** Does the claimant have a "severe impairment"?  If so, proceed

28  to step three.  If not, then a finding of not disabled is appropriate.

1   **Step three:**  Does the claimant's impairment or combination of

2   impairments meet or equal an impairment in 20 C.F.R., Part 404, Subpart P,

3   Appendix 1 (hereinafter "the Listings")?  If so, the claimant is automatically

4   determined disabled.  If not, proceed to step four.

5   **Step four:**  Is the claimant capable of performing his past work?  If so,

6   the claimant is not disabled.  If not, proceed to step five.

7   **Step five:**  Does the claimant have the residual functional capacity to

8   perform any other work?  If so, the claimant is not disabled.  If not, the

9   claimant is disabled.

10  Lester, 81 F.3d at 828 n.5.

11  "Severe" (at step two) means any impairment or combination of

12  impairments that significantly limits the physical or mental ability to perform

13  basic work activities.  "Residual functional capacity" ("RFC") is what a

14  claimant can still do despite existing "exertional" (i.e, strength related) and

15  "nonexertional" limitations.  Cooper v. Sullivan, 880 F.2d 1152, 1155 ns.5-6

16  (9th Cir. 1989).  Nonexertional limitations restrict ability to work without

17  directly limiting strength, and include mental, sensory, postural, manipulative

18  and environmental limitations.  Penny v. Sullivan, 2 F.3d 953, 958 (9th Cir.

19  1993); Cooper 800 F.2d at 1155 n.7; 20 C.F.R. §404.1569a(c).[1]

20  A claimant has the burden (through step four) of proving inability to

21  perform past relevant work.  Reddick, 157 F.3d at 721; Drouin v. Sullivan, 966

22  F.2d 1255, 1257 (9th Cir. 1992).  If this burden is met, a prima facie case of

23

24      [1]Nonexertional limitations include difficulty in one or more of the following:
25  functioning because of nervousness, anxiety or depression, maintaining attention or
    concentration; understanding instructions; seeing or hearing, tolerating physical features
26  of a work setting; and manipulative or postural functions (e.g. reaching, handling,
    stooping or crouching).  See 20 C.F.R. § 404.1569a(c)(1).  Pain may be either an
27  exertional or nonexertional limitation.  Penny, 2 F.3d at 959; Perminter v. Heckler, 765
28  F.2d 870, 872 (9th Cir. 1985); 20 C.F.R. § 404.1569a(c).

1    disability is established and the burden shifts to the Commissioner (step five)

2    to establish that the claimant can perform alternative work.  Reddick, 157 F.3d

3    at 721; Drouin, 966 F.2d at 1257; 20 C.F.R. §§ 404.1520,  416.920.  The

4    Commissioner can meet this burden by reference to the Medical-Vocational

5    Guidelines ("Grids") at 20 C.F.R. Part 404, Subpart P, Appendix 2, or by

6    relying on vocational expert ("VE") testimony.  Osenbrock v. Apfel, 240 F.3d

7    1157, 1162 (9th Cir. 2001) (citing Desrosiers v. Secretary, 846 F.2d 573, 576-

8    77 (9th Cir. 1988)).  If VE testimony is used, "the VE must identify a specific

9    job or jobs in the national economy having requirements that the claimant's

10   physical and mental abilities and vocational qualifications would satisfy."

11   Osenbrock, 240 F.3d at 1162-63.

12   **B.    Additional Five-Step Sequential Evaluation for Mental**

13        **Impairments.**

14        Where there is evidence of a mental impairment that allegedly prevents a

15   claimant from working, the Commissioner must supplement the five-step

16   sequential evaluation process with additional regulations dealing specifically

17   with mental impairments.  Maier v. Commissioner of the Soc. Sec. Admin.,

18   154 F.3d 913, 914 (9th Cir. 1998) (per curiam).  The relevant regulations

19   establish another five-step sequential evaluation procedure to be employed in

20   evaluating mental impairments.  Id.  The procedure requires the evaluator to

21   perform the following five steps:

22        **Step 1:** determine whether a mental impairment exists by recording

23   pertinent symptoms and limitations;

24        **Step 2:** determine whether "certain medical findings which have been

25   found especially relevant to the ability to work are present or absent";

26        **Step 3:** determine whether the impairment is severe by rating the degree

27   of functional loss resulting from the impairment;

28        **Step 4:** determine whether the impairment, or a combination of

impairments, meet or equal a mental disorder listed in 20 C.F.R. pt. 404 subpt. P, Appendix I; and

**Step 5:** complete a mental residual functional capacity assessment. Maier v. Commissioner of the Soc. Sec. Admin., 154 F.3d at 914-15 (citing 20 C.F.R. § 416.920a).

When dealing with alleged mental disabilities, the inquiry at step three has two parts. In the first part, (Part A), the ALJ must determine whether there is evidence to "medically substantiate the presence of a mental disorder." 20 C.F.R. pt. 404 subpt. P, Appendix I at § 12.00A. When making this initial determination, the ALJ can rely only on "medical evidence consisting of clinical signs, symptoms and/or laboratory or psychological test findings." Id. at § 12.00B; Schnieder v. Commissioner of Social Security Administration, 223 F.3d 968, 974 (9th Cir. 2000).

In the second part, (Part B), the ALJ must determine whether the "severity" of the claimant's "functional limitations" are "incompatible with the ability to work." 20 C.F.R. pt. 404 subpt. P, Appendix I at § 12.00A; Schneider, 223 F.3d at 974. The ALJ makes this determination by ranking the severity of the claimant's deficiencies (e.g. non, slight, moderate, marked, extreme) in four different categories (e.g. daily living; social functioning; concentration, persistence, or pace; and episodes of deterioration). If the ALJ finds that a claimant's functional limitations are at the extreme or marked level in two of the four categories, then the claimant satisfies Part B [of the Listing]. See 20 C.F.R. pt. 404 subpt. P, Appendix I at § 12.04B; Schneider, 223 F.3d at 975.

///
///
///
///

- 15 -

# V.  DISCUSSION

**A.    The ALJ's Evaluation.**

The ALJ concluded (at step one) that plaintiff has not engaged in substantial gainful activity since his application date.  (CAR 31.)  Next, the ALJ determined (at step two) that plaintiff suffers from an impairment or combination of impairments considered "severe" under 20 C.F.R. §404.1520(b).  (CAR 31.)  At step three, the ALJ found that, excluding plaintiff's drug addiction and alcoholism, plaintiff's impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P Regulations No. 4.  (CAR 31.)  The ALJ concluded (at step four) that plaintiff can no longer perform his past relevant work.  (CAR 31.)  At step five, the ALJ concluded that plaintiff is not disabled as he is capable of performing work as specified by the VE.  (CAR 32.)

The parties have stipulated that the following issue is in dispute, to wit: Whether the ALJ improperly rejected the opinion of plaintiff's treating physician.  (Joint Stipulation, p. 3.)

**B.    Treating Physicians.**

Plaintiff argues that the ALJ failed to give proper weight to Dr. Compton's September 10, 2003 conclusion that "[p]laintiff is disabled beginning April 30, 2003, as a result of his chronic condition."  (Joint Stipulation, p. 3 (citing CAR 285).)  Defendant noted that the ALJ found that "Dr. Compton's assessment never excluded the effects of plaintiff's documented drug abuse and alcoholism, which defendant argues is a specific and legitimate reason for rejecting Dr. Compton's finding.  (Id. at 5-6 (citing CAR 22-23).)

The opinion of a treating doctor generally should be given more weight than opinions of doctors who do not treat the claimant.  Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996).  If the treating doctor's opinion is not

1  contradicted by another doctor, it may be rejected only for "clear and

2  convincing" reasons supported by substantial evidence in the record.  Id. at 830

3  (citing Baxter v. Sullivan, 923 F.2d 1391, 1396 (9th Cir. 1991)).  Even when

4  the treating doctor's opinion is contradicted by the opinion of another doctor,

5  the ALJ may properly reject the treating doctor's opinion only by providing

6  "'specific and legitimate reasons' supported by substantial evidence in the

7  record for so doing."  Id. (citing Murray v. Heckler, 722 F.2d 499, 502 (9th Cir.

8  1983)).  The opinion of an examining physician is, in turn, entitled to greater

9  weight than the opinion of a nonexamining physician.  Lester v. Chater, 81

10  F.3d at 830; Gallant v. Heckler, 753 F.2d 1450 (9th Cir. 1984).

11      Where the ALJ fails to provide adequate reasons for rejecting the opinion

12  of a treating or examining physician, those opinions are credited "as a matter of

13  law."  Lester v. Chater, 81 F3d at 834 (quoting Hammock v. Bowen, 879 F.2d

14  498, 502 (9th Cir. 1989).

15      Since there are inconsistencies between the findings of Dr. Compton and

16  other evidence of record, the ALJ was required to state "'specific and legitimate

17  reasons' supported by substantial evidence in the record" for rejecting those

18  opinions.  Lester v. Chater, 81 F.3d at 830 (citing Murray v. Heckler, 722 F.2d

19  at 502).  As noted by defendant, the ALJ rejected Dr. Compton's September

20  10, 2003 assessment because "Dr. Compton never opined in regard to the

21  claimant's mental functional capacity with drug abuse and alcoholism excluded

22  from the assessment."  (CAR 22-23.)  However, in coming to this conclusion

23  the ALJ ignored the fact that on February 3, 2003, Dr. Compton concluded

24  that plaintiff's condition was not the result of alcohol or substance abuse.

25  (CAR 297.)  Thus, Dr. Compton's September 10, 2003 assessment, made over

26  seven months after his conclusion regarding the involvement of plaintiff's

27  alcohol and drug use, was necessarily made with the understanding that

28  plaintiff's condition was not caused by alcohol or drug abuse.  Thus, the ALJ's

1   reason for rejecting Dr. Compton's September 10, 2003 assessment, although

2   specific, was not legitimate.

3        Moreover, this Court notes that the ALJ dismissed Dr. Compton's

4   revised diagnosis of schizoaffective disorder, bipolar type, partially

5   compensated, because "it is clear from the whole of the record that some of the

6   claimant's reports were misinterpreted as symptoms of psychiatric illness." The

7   ALJ further noted that some of plaintiff's reports were not "paranoid ideation,

8   but [were] well-grounded in actual fact." (CAR 19.) Notwithstanding, these

9   factual revelations, the ALJ may not substitute his own opinions for the

10  opinions of a physician by reaching his own conclusions about the evidence.

11  Day v. Weinberger, 522 F.2d 1154 (9th Cir. 1975). Importantly, although

12  plaintiff did provide the ALJ with factual bases for many of the peculiar

13  episodes plaintiff reported to Dr. Compton, the ALJ himself acknowledges that

14  plaintiff provided factual support for only "some" of plaintiff's reports. (CAR

15  19.) In addition, at the time Dr. Compton revised his diagnosis, he reported

16  plaintiff's complaints of sleep disturbance and "[t]houghts going faster." (CAR

17  297.)

18       Accordingly, Dr. Compton's findings as to plaintiff's mental impairment

19  are credited as a matter of law. Lester v. Chater, 81 F3d at 834 (quoting

20  Hammock v. Bowen, 879 F.2d 498, 502 (9th Cir. 1989).

21  **C.    Remedy**

22       The decision whether to remand for further proceedings or order an

23  immediate award of benefits is within the district court's discretion. Harman v.

24  Apfel, 211 F.3d 1172, 1175-78 (9th Cir. 2000). Where no useful purpose

25  would be served by further administrative proceedings, or where the record has

26  been fully developed, it is appropriate to exercise this discretion to direct an

27  immediate award of benefits. Id. at 1179 ("the decision of whether to remand

28  for further proceedings turns upon the likely utility of such proceedings").

However, where there are outstanding issues that must be resolved before a determination of disability can be made, and it is not clear from the record that the ALJ would be required to find the claimant disabled if all the evidence were properly evaluated, remand is appropriate.  <u>Id.</u>

Here, this Court has concluded that the ALJ erred in failing to give proper weight to Dr. Compton's assessment of plaintiff's disability.  This Court has also concluded that the ALJ erred in rejecting Dr. Compton's revised diagnosis.  Accordingly, this Court has credited Dr. Compton's findings as a matter of law.  The Court thus concludes that remand is appropriate so that the ALJ may consider plaintiff's allegations of disability in light of Dr. Compton's credited assessment.

## **ORDER**

Accordingly, IT IS HEREBY ORDERED that the decision of the Administrative Law Judge is vacated and this action is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS FURTHER ORDERED that the Clerk of the Court serve copies of this order and the Judgment herein on all parties or their counsel.

DATED:  January 5, 2006

_____
/s/
JEFFREY W. JOHNSON
United States Magistrate Judge